MESCH, CLARK & ROTHSCHILD, P.C.
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax:   (520) 798-1037
Email: mmcgrath@mcrazlaw.com
       knye@mcrazlaw.com
       irothschild@mcrazlaw.com
By:    Michael McGrath, # 6019
       Kasey C. Nye, #20610
       Isaac D. Rothschild, #25726
       91030-1

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

In re:

TRISPORTS.COM LLC, an Arizona limited liability company

Debtor.

Chapter 11 Proceeding

Case No. 4:13-bk-10289-EWH

## OMNINBUS DECLARATION OF SETON CLAGGETT IN SUPPORT OF BANKRUPTCY PETITION, FIRST DAY MOTIONS & §105 INJUNCTION

SETON CLAGGETT, declares as follows:

1) I am an adult person and resident of Pima County Arizona, authorized representative and manager of TriSports.com, L.L.C. ("TriSports" or "Debtor").

2) I am familiar with the Debtor's business and financial affairs. I am familiar with the recordkeeping system for Trisports.com. In providing this testimony I am relying on the business records of Trisports.com that are comprised of memoranda, reports, records, and data compilations recording acts or events at or near the time the acts or events took place,

transmitted by employees with personal knowledge of the events or acts, and recorded in the ordinary course of Trisports.com business activity. It is our regular practice to keep such records I submit this Declaration on personal knowledge of the Debtor in connection with the Debtor's voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, filed on June 14, 2013 (the "Petition Date"). The statements set forth below are true to the best of my knowledge and if called to testify as to those statements, I could do so competently.

3) This Declaration is submitted in support of the factual allegations contained in the following Motions and Injunctive Complaint pursuant to §105 (collectively the "First Day Motions"), filed contemporaneously with this Declaration:

- Emergency Motion for Interim Order: 1) Authorizing Use of Cash Collateral; 2) Order Scheduling Final Hearing on Use of Cash Collateral; and 3) Final Order Authorizing Use of Cash Collateral;

- Emergency Motion to Pay Pre-Petition Wages;

- Emergency Motion for Order under §364(b) Authorizing Debtor to Obtain Post-Petition Financing on an Unsecured Administrative Claim Basis and to Set a Final Hearing

- Emergency Motion for Entry of Order Authorizing Debtor to Honor Pre-Petition Obligations to Customers and to Otherwise Continue Customer Programs and Practices in the Ordinary Course of Business

- Verified Complaint and Application for Preliminary Injunction

## DESCRIPTION OF THE DEBTOR

4) On the Petition Date, the Debtor filed a voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. (as amended) (the "Bankruptcy Code"), which is pending before the United States Bankruptcy Court for the District of Arizona (the "Court").

5) TriSports.com is an online and retail triathlon gear shop that carries the highest quality equipment, gear, apparel, bikes, and other hard to find necessities for triathletes such as wetsuits, bike travel cases, aero race wheels, hydration systems, and nutrition products.

6) Launched in April 2000 out of two bedrooms in mine and Debbie Claggett's house, TriSports.com was created as a result of my training for his first Ironman in the summer of 1999.

7) I had been having a hard time finding a local source for triathlon equipment. After several hours of baking in the Tucson sun, I came up with a grand idea - start an online triathlon store.

8) I couldn't find all the necessities locally then there had to be others with the same predicament.

9) I didn't exactly have the retail experience to run an online store (I was working on his MS in Hydrology at the time).

10) After completing the Ironman I took that extra 20-hours a week I was putting into training and started working on the foundation of what is now TriSports.com.

11) Developing a superior customer service ethic, thanks mainly to Debbie Claggett (who was working full time to support us and providing "after-hours" customer support), the store gained traction quickly.

12) Both Debbie and I understood what it took to make this work: with my background in triathlon and his understanding of the urgency in which triathletes need their gear,

coupled with Debbie's understanding of providing a great customer experience, we created the ultimate shop for triathletes.

13) Today TriSports.com receives more than 400,000 unique visitors to its website each month, and had developed a homegrown subscriber/customer list of more than 145,000 people.

14) In 2006, TriSports.com moved into its current a 32,000 sq ft facility housing a state-of-the-art retail store, warehouse, and corporate headquarters.

15) Today approximately 32 people work at the facility in IT, marketing, customer service, order fulfillment, retail and corporate functions.

16) The Tucson retail store attracts thousands of visitors from out of state, who come to Tucson to shop and to train.

17) TriSports.com is more than just an on-line retailer presence. The company is also very involved with growing the sport through partnerships with races, clubs, teams and other endeavors, as well as being actively involved in the local Tucson community.

18) TriSports.com has been recognized as one of Outside Magazine's Best Places to Work (April 2009 & 2010), by *Triathlete* magazine as one of Triathlete's Best Places to Work (2010), as one of the top 100 bike shops in the U.S. by the National Bicycle Dealers Association (2010 & 2011), as a top 10 triathlon store by Triathlon America (2011), by Comerica Bank as one of Arizona's 50 Companies to Watch (October 2008), Seton and Debbie Claggett were recognized as one of BizAZ's Top 35 Entrepreneurs Under 35 (June 2008), and by Wells Fargo with their Copper Cactus Award for Business Growth (October 2005).

19) TriSports.com is also strongly committed to being a green business and good corporate citizen. In 2011 TriSports.com was recognized as "Arizona's Greenest Workplace."

20) TriSports.com has one of the largest rainwater harvesting systems in Arizona, the tanks hold a combined 36,000 gallons of water collected from the roof, both rain and condensate from the evap coolers, and goes to cover the landscaping needs. These tanks are also a City of Tucson Water Harvesting Demonstration Site.

21) In addition TriSports.com has a 128kW solar array that covers approximately 90% to 100% of the building's energy usage. Panels are located on the roof, as well as two shade structures over the parking lot.

22) Along with the very visible "green" features that TriSports.com has in place, there are many other programs and processes in place. The employees are all dedicated to lowering their environmental footprint, so ideas come from everyone on what can be done to this end. Some of these efforts include:
- Dual light controls in office spaces, along with plenty of natural light, so everyone thinks twice before flipping those switches.
- Zoned A/C throughout to ensure that only the spaces being used are being cooled.
- Extensive recycling – the recycling container is about 4x larger than the trash container, and it doesn't stop with paper. TriSports.com recycles the pallets that bring our shipments to us, the boxes that come in our back door, clothing, shoes, bike parts and more!
- Commuter program which encourages employees to bike to work by giving them a credit for every mile they commute, along with contests and awards to make it fun and interactive.
- Herman Miller furniture throughout, most of which is made from recycled material and can be recycled after its useful life.
- Carpet tiles made from recycled materials, which also make it easy to replace small areas rather than having to entirely re-carpet if something were to damage it.

- Greenbox program which gives our customers the option to receive a recycled box and packing material instead of new (about 90% of its customers choose this option).
- Shoe collection program which donates collected shoes to a local non-profit for reuse within the Tucson community.
- Bike parts are donated to Resource Revival to be re-made into art and awards.

## THE DEBTOR'S CAPITAL STRUCTURE

*Bank of the West*

23) In June of 2011 TriSports.com entered into a loan agreement with the Bank of the West for a revolving line of credit in the with a maximum amount of $1,000,000.00 (the "Operating Line") was memorialized by a Promissory Note ("Note 1") that was executed by TriSportson or about June 23, 2011.

24) On the same date, Seton and Debbie Claggett executed a personal guaranty of TriSports.com's obligations under Note1.

25) Simultaneously with executing Note 1 TriSports.com executed and delivered to the Bank a Commercial Security Agreement (the "Security Agreement"). The Security Agreement granted the Bank a security agreement in certain personal property of TriSports(the "Collateral"), namely:

> All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or

whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

26) Bank of the West perfected its security interest in the Collateral by filing a UCC-1 financing statement with the Arizona Secretary of State's office on July 22, 2011 at record number 2011-165-7781-1.

27) Subsequently the Bank separately loaned an additional sum of $800,000.00 (Eight Hundred Thousand Dollars) to TriSports for purposes of acquiring equipment and software (the Equipment Loan).

28) This transaction was memorialized by a Promissory Note ("Note 2") that was executed by TriSportson or about October 27, 2011. Repayment of Note 2 is secured by the same collateral as Note 1 and is also personally guaranteed by the Claggetts.

29) Presently, the inventory that is subject to this security interest has a book value (at cost) of approximately $2.6 million and a retail value of approximately $3.7 million.

30) Similarly the equipment that is subject to this security interest has a book value of approximately $#.#.

31) Notes 1 and 2 matured by their terms on October 15, 2012.

32) On or about February 13, 2013, the Bank caused a Notice of Maturity and Demand for Payment initiated suit in Pima County Superior Court, under Case No.C20131286, seeking among other things, judgment on the notes and the guaranty, in addition to a writ of replevin to obtain possession of its collateral (the "Superior Court Action").

33) As of the filing of its complaint in Pima County Superior Court Case No. C20131286 on March 8, 2013, the Bank asserted that it is owed the principal amount of $1,770,112.91, plus accrued and accruing interest, default interest, late charges, costs, attorneys' fees and expenses.

*American Express Merchant Loan*

34) On November 6, 2012 the Debtor entered into a Loan Agreement with American Express Travel Related Services Company ("AMEX") for a revolving line of credit in the maximum amount of $275,000.

35) Under this loan TriSports.com granted American Express a security interest in among other things "any and all amounts owing to you now or in the future from any merchant processor, including the Settlement Amounts," as well as accounts, chattel paper, goods, including equipment and inventory, general intangibles, etc..

36) Under this loan AMEX is repaid by applying 25% of the proceeds of all American Express card transactions on line or in the retail store to the loan.

37) AMEX has perfected its interest in the settlement amounts on American Express card transactions through possession, and by recording a UCC-1 financing statement with the Arizona Secretary of State on November 9, 2012 at record number 2012-171-3139-5.

38) As of the petition date, the Debtor estimates that it owes AMEX approximately $ 111,835.

*Vendor Security Agreements*

39) In addition to Bank and American Express, the Debtor has granted purchase money security interests to several vendors that may be senior in priority to Bank of the West's interest in TriSports.com's inventory:

- Cervelo Cycles Inc. of Toronto, Ontario Canada, asserts a purchase money lien in the inventory purchased from it pursuant to a UCC-1 form that was recorded at the Arizona Secretary of Office on November 21, 2006 at record number 2006-145-3134-5 continued by a recording on October 18, 2011. According to TriSports.com's books and records as of May 31, 2013 the Debtor had inventory with a book value of approximately $102,244.56 that is

subject to the lien. The Debtor currently owes Cervelo Cycles is approximately $ 73,000.29.

- Orbea USA, LLC asserts a purchase money lien in the inventory purchased from it pursuant to a UCC-1 form that was recorded at the Arizona Secretary of Office on February 7, 2012 at record number 2012-168-0721-0. According to TriSports.com's books and records as of May 31, 2013 the Debtor had inventory with a book value of approximately $255,800.30 subject to this lien. Obrea USA is owed approximately $ 140,773.29.
- Quality Bicycle Products, Inc, asserts a purchase money lien in the inventory purchased from it pursuant to a UCC-1 form that was recorded at the Arizona Secretary of Office on August 29, 2008 at record number 2008-155-3051-1. According to TriSports.com's books and records, as of May 31, 2013 had inventory with a book value of approximately $ 75,528.57 subject to this lien, and Quality Bicycle Products USA is owed approximately 55,503.56.
- K2 Corporation asserts a purchase money lien in the purchased from it pursuant to a UCC-1 form that was recorded at the Arizona Secretary of Office on May 10, 2010 at record number 2010-161-5797-9. According to TriSports.com's books and records, as of May 31, 2013 it holds inventory with a book value of approximately $ 183,298.84 that is subject to this lien. K2 Corporation is owed approximately $ 172,477.18.

*Seton & Debbie Claggett*

40) Since the inception of TriSports.com in 2000, Debbie Claggett and I have provided the Debtor liquidity out of their personal resources and credit arrangements.

41) Effectively this arrangement has been an unsecured revolving line of credit in which the we advance up to $450,000 each month which TriSports repays from available cash flow.

42) This line of credit is loaned by us on an unsecured basis at their cost of funds (typically 0.0%).

43) The liquidity provided by us is an essential part of their business.

44) Since 2010, we have advanced (primarily using personal lines of credit and credit cards) in excess of $ 4,322,274.

**EVENTS LEADING TO CHAPTER 11 FILING**

45) Since executing Note 2 in favor of the Bank approximately 19 months ago, TriSports.com has experienced a confluence of setbacks that culminated in the Bank filing the Superior Court Action that would force TriSports.com to close with catastrophic effects for other creditors.

46) Our problems began with the Debtor's changing the software that forms the backbone of its operations comprehensive software for marketing, order processing, shipping and customer management) to Ecometry (JDA Direct Commerce).

47) The software transition has experienced many unforeseeable problems, including causing TriSports.com to lose over $500,000 of e-commerce transactions.

48) The problems with the software have required an extraordinary amount of management attention and energy.

49) Indeed we are still working with the software provider to iron out the bugs.

50) TriSports.com's attempted to expand its bricks and mortar retail operation from Tucson to Tempe.

51) Opening the store in Tempe required the investment of over $750,000, including $100,000 of unreimbursed tenant improvements, $350,000 of inventory and $300,000 of FF&E.

52) The operation in Tempe was never profitable, and was closed at the end of May 2013.

53) All but two of TriSports' suppliers put their products directly on Amazon.com. This has led to compression of margins, and loss of market share

54) According, to Dan Empfield's "The Future of Bike Retail" http://www.slowtwitch.com/Features/The_Future_of_Bike_Retail_3510.html TriSports.com has seen its market-share of triathlon-specific-racing bikes drop from 15% in 2011 to 8% in 2013, while Amazon has seen its market share grow from 7% in 2011 to 15% in 2013.

55) As a result the Debtor has experience significant declines in top line revenue; specifically year to date revenue is down 21% compared to the same time in 2012.

56) TriSports.com filed this reorganization case to restructure is obligations through a plan of reorganization, implement cost cutting and other operational changes to reset the business on a sustainable path for growth, including important new initiatives to better exploit its customer lists, to implement multi-channel marketing and to begin selling through the Amazon and E-Bay channels.

## STATEMENTS IN SUPPORT OF FIRST DAY MOTIONS

57) The following statements are submitted in support of First Day Motions and are based upon personal knowledge or knowledge obtained from employees of the Debtor. The capitalized terms used below shall have the meaning ascribed to such terms in each respective pleading. Defined terms used below shall be limited to the description of each respective motion in which such defined terms are contained.

### I. THE CASH COLLATERAL BUDGET

58) TriSports.com is proposing a 13-week operational budget that runs through the week ending September 8th, a true and correct copy of which is attached to this Motion as Exhibit "A" to the Cash Collateral Motion.

59) The budget sets forth anticipated revenue and operating expenses.

60) The Debtor commits that its total disbursements will not exceed 10% of budget measured monthly.

61) The Debtor propose to provide adequate protection to the Bank of the West and the Vendor Secured Creditors by granting replacement liens on the new inventory purchased by the Debtor and on the proceeds generated from the sale and use of each secured creditor's existing accounts, inventory and other collateral, to the same nature, extent and priority as the creditor enjoyed prepetition.

62) The Bank of the West will be more than adequately protected by the replacement liens and by the value of its equipment collateral pending a final hearing on use of cash collateral, during which time the debtor will negotiate an adequate projection payment.

63) With respect to AMEX, the Debtor proposed to, notwithstanding the automatic stay, to continue to allow AMEX to withhold 25% of Settlement Amounts in the ordinary course of business.

64) AMEX will continue to be required to account for such funds and remit the balance to TriSports.com.

## II. Motion to Pay Pre-Petition Wages

65) The Debtors employ approximately 32 employees as of the Petition Date (the "Employees"), in Tucson, Arizona.

66) The Employees perform a variety of critical functions, related to the operation of the Debtor's business. The Employees' skills, knowledge, and understanding of the Debtor's business are among the Debtor's most valuable assets. If pre-petition compensation and benefits are not received by the Employees in the ordinary course of business, they will suffer substantial personal hardship and unnecessary distraction from their duties, which may result in diminished Employee morale and unmanageable Employee turnover. As a result, the Debtor's ongoing business operations would suffer immediate and pervasive

damage. The harm to Employees would adversely affect the Debtor and its ability to function, resulting in irreparable harm to the Debtor and its estate.

67) The employees of the Debtor are critical to its business, all employees receiving payment pursuant to this Motion will be retained in the ordinary course of the Debtor's business.

68) The accrued pre-petition obligations owing to individual Employees will be substantially less than the statutory priority cap of $12,475.00 that is set by Bankruptcy Code §§ 507(a)(4) and (a)(5) of the Bankruptcy Code.

69) The Debtor will not pay any pre-petition obligations owing to individual Employees beyond the statutory cap of $12,475.00.

70) Debtor's Employee Obligations and Employee Benefits include salaries and wages, payroll taxes, payroll deductions and withholdings, vacation, sick, and holiday time, retirement obligations, commuter credits, marketing reimbursements, health insurance premiums and contributions, and life premiums and contributions. The Debtor customarily either paid or withheld all of these Employee Obligations and Employee Benefits in the ordinary course of business.

71) Every other Friday the Employees receive payment for hourly wages or salaries earned through the preceding two weeks.

72) The Debtors' last pay period commenced Monday, June 3, 2013 and will end Sunday, June 16, 2013. In the ordinary course of business, this pay period would be paid on Friday, June 21, 2013.

73) Wages and salaries for work performed from May 20, 2013 through June 2, 2013 were paid in the ordinary course of business on June 7, 2013.

74) The Debtor seeks to pay pre-petition wages on June 21 for wages incurred between June 3, 2013 and the Petition Date totaling approximately $35,837.53.

75) This bi-weekly pay estimate includes the wages for myself and my wife, which wages collectively total approximately $1,500 each week.

76) No employee will be paid more than the statutory limit of $12, 475.

77) The Debtor is required by law to withhold from each Employee's paycheck certain amounts related to federal, state, and local income taxes as well as social security and Medicare taxes (collectively, the "Withholding Taxes") for remittance to the appropriate taxing authorities. The Debtor must also match from their own funds social security and Medicare taxes withheld, and pay (based on a percentage of gross payroll) additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtor seeks authority to fund all such Payroll Taxes in the ordinary course of business.

78) The Debtor provides their Employees with health insurance benefits. The Debtor seeks authority to satisfy all of their pre-petition obligations related to the health benefits (e.g. to pay any pre-petition insurance premiums that remain outstanding as of the Petition Date) and to remit all withholdings associated with such employee benefits.

79) The Debtor makes certain 401(k) contributions on behalf of their employees for each payroll period. The Debtor seeks authority to continue paying such amounts, in the ordinary course of business.

80) The Debtor maintains workers' compensation insurance for each of their eligible employees. The Debtor seeks authority to continue to remit such insurance payments, as well as refer any claims, in the ordinary course of business.

81) The Debtor maintains workers' compensation insurance for each of their eligible employees. The Debtor seeks authority to continue to remit such insurance payments, as well as refer any claims, in the ordinary course of business.

### III. MOTION FOR ORDER UNDER §364(b) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING ON AN UNSECURED ADMINISTRATIVE CLAIM BASIS

82) The Debtor cannot operate its on line retail businesses without sufficient operating funds.

83) The Debtor business depends on cash to acquire new inventory and essential services such as website hosting.

84) The proposed debtor-in-possession financing (the "DIP Loan") is necessary to keep the Trisports.com operational while a reorganization plan is prepared.

85) Having an assured liquidity allows the Debtor to encourage employees, customers and vendors to deal with Trisports.com as a going concern that will maximize the recovery to creditors.

86) This proposed post-petition *debtor-in-possession* financing is necessary to maintain the Debtors' business relationships with vendors and suppliers, and to meet their working capital needs, to ensure the Debtor's business operations are not interrupted, and to ensure that this Chapter 11 case proceeds optimally.

87) The Debtor has concluded that obtaining post-petition financing is integral to the success of its Chapter 11 case and in the best interest of the Debtor and its estate.

88) Indeed, without the DIP Loan, the Debtor's cases would be less stable.

89) The Debtor's use of cash during the pendency of the Chapter 11 case is absolutely necessary to allow the Debtor to continue to operate.

90) The Debtor therefore proposes to borrow up to $450,000 on a revolving basis from myself and Debbie Claggett.

91) As described in the 13-week operational budget (attached as Exhibit A to the Motion for Cash Colalteral) the Debtor anticipates borrowing between $50,000 and $75,000 each week under this financing arrangement.

92) Debbie Claggett and I are willing to provide the Debtor revolving debtor-in-possession financing on an unsecured basis with administrative priority under 11 U.S.C. § 503(b).

93) As has been the Debtor's historic practice, Debbie Claggett and I will use personal resources, including savings, lines of credit, and credit cards to provide this financing.

94) Also consistent with Trisports.com's historic practice we will charge the Debtor their personal cost of funds for the financing.

95) Consistent with the Debtor's historic practice the Claggetts anticipate that the primary source of the financing will be personal credit cards, which if repaid within the grace period (which is Trisports.com's historic practice), cost at or near nothing.

96) , the Debtor is confident that it can maintain the stability of its operations during the remainder of this Chapter 11 case with access to this financing.

97) The Debtor has investigated and analyzed alternatives to this financing and determined that this is the best available alternative under the circumstances.

### IV. MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTOR TO HONOR PRE-PETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE CUSTOMER PROGRAMS AND PRACTICES IN THE ORDINARY COURSE OF BUSINESS

98) As part of maintaining its reputation, and to continue to attract both past and new customers, Trisports.com engages in certain customer programs in the ordinary course of its business prior to the Petition Date. These include the providing gift cards, gift certificates, honoring merchandise returns, coupons, and other promotional programs (collectively, the "Customer Programs").

99) The Customer Programs create incentives for increased customer usage and loyalty and to ensure that the customers are pleased with its choices to purchase from TriSports.com resorts rather than competitors. The common goals of the Customer Programs have always been to meet competitive business pressures, ensure customer

satisfaction, and generate goodwill for the Debtor, thereby retaining current customers and attracting new ones to ultimately enhance net revenue.

100) To preserve, in this post-petition period, our critical business relationships and goodwill we believe that it is in TriSports.com's best interests, and the best interests of its estate and creditors, to be allowed to continue its Customer Programs.

101) We are concerned that the fact of the Reorganization Case could negatively influence customers' attitude and behavior toward TriSports.com unless the Debtor can alleviate customer concerns. In particular, TriSports.com's goodwill and ongoing customer relationships may erode if customers perceive that the Debtor is unable or unwilling to fulfill the pre-petition promises the Debtor made through its Customer Programs. The same would be true if customers perceived that the Debtor will no longer be offering its full complement of traditional quality of customer service preferred by its customers.

DATED this June 14, 2013.

By_____
Seton Claggett